[No. AO16228. First Dist., Div. Four. Oct. 7, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
ASTERIO LA FARGUE, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Parts I, III, IV, and V are not published, as they do not meet the standards for publication contained in rule 976(b), California Rules of Court.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Elaine L. Sierra and Joel Kirshenbaum, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Ann K. Jensen and Morris Lenk, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SULLIVAN, J.**\*—Appellant Asterio La Fargue was convicted by a jury of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a))[2] and sentenced to the upper term of imprisonment of four years. A mistrial was declared on the remaining charges of assault with intent to rape, and false imprisonment (§§ 220, 236) after the jury was unable to reach verdicts. All charges arose out of events occurring on the evening of July 20, 1981, in San Francisco. Appellant challenges the sufficiency of the evidence to support the verdict, and contends there were numerous instructional errors and prosecutorial misconduct.

Randi J., age 16, spent the evening visiting her 19-year-old sister Roxanne, who lived on Army Street with her husband and 2 children. The two sisters spent the evening drinking and talking. At about 10:30 p.m., after they had consumed about a half-pint to a pint of whiskey, they walked to a nearby store to purchase cigarettes. There they noticed a man who was later identified as appellant.

The two sisters walked back to Roxanne's apartment. According to Roxanne's husband, there was no one with them when they returned to the apartment. Randi stayed at the apartment for approximately half an hour, drinking and talking with her sister. At about 12 or 12:30 a.m., Randi left to walk home, declining her sister's offer to escort her home. She felt somewhat "buzzed" from the drinks she had had earlier. As she was walking, she suddenly felt someone grab her from behind. She turned and recognized the man as the same person she had seen earlier in the store. The man then dragged her into a pickup parked nearby, drove the vehicle for several blocks, and parked it in the vicinity of Holly Park. Randi identified appellant as the man who had forced her into the pickup.

Once inside the pickup, appellant attempted to kiss Randi and initially she did not actively resist. She testified that she remembered reading or hearing that it was best not to struggle in such situations. Appellant grabbed the side

---

*Assigned by the Chairperson of the Judicial Council.

[2]Unless otherwise indicated, all further statutory references are to the Penal Code.

of her jeans and ripped them from the waist to the middle of her leg. At this point, Randi struggled with appellant and attempted to push him away. Appellant punched her in the face, causing her nose to bleed profusely. The force of the blow knocked her head against the interior side of the door panel. Randi continued struggling with appellant. He hit her again in the face with his hand.

At about this time, Paul Carrero was walking along Mission Street and heard a woman screaming, "No, No." He saw two people in a truck parked nearby who appeared to be fighting. Carrero next saw appellant emerge from the truck and pull up the zipper of his pants. Appellant looked directly at Carrero for about 30 to 40 seconds, then ran across the street. Carrero observed that appellant was carrying a bottle. Carrero went to his residence nearby and a few minutes later heard someone knocking frantically at his door. When he opened the door he saw Randi, wearing only underpants and a T-shirt. She was covered with blood. Carrero immediately called the police.

Officer Mahar arrived on the scene. He also observed that Randi's face and clothing were covered with blood. She was hysterical and also appeared to be somewhat intoxicated. She told the officer and a paramedic that someone had attempted to rape her. She pointed out the pickup parked nearby. Officer Mahar examined it and saw blood smeared over the seat and the door on the passenger side.

Randi was then taken to the hospital for treatment. The examining physician described her appearance as "battered" and "disheveled." Her clothes were ripped and she had blood on every article of her clothing. The doctor listed her injuries as follows: "she had several injuries to her head, including a scratch behind the right ear, bruises on her forehead, nose and chin, plus a swollen and bruised upper lip and two small cuts on her inner lip near the front teeth." The blood on her body, from her scalp and face down to her arms and legs, was apparently from an extensive nose bleed from both nares. She also had scratches on her abdomen, wrist, thumb, lower back and groin area and scrapes on her buttock, shoulder, back, elbow, thigh, and on the torso between the groin and navel. The doctor testified that it would have taken three to four blows to inflict the injuries to her face, although a single blow could have resulted in the nosebleed.

San Francisco Police Inspector Williams was assigned to investigate the case. His investigation led to appellant as a suspect. Inspector Williams attempted to reach appellant, but received no response to messages he left at his residence. A warrant was ultimately issued, and appellant was arrested. In his initial statement to police appellant said that he did not "so-

cialize" with women to whom he had not been "formally introduced." He stated that he was not in San Francisco on the night of the attack, and that he was working at a construction site in San Mateo that evening.

Appellant testified in his own defense. He admitted that the initial statement made to the police was false. He testified that at about 11:30 p.m. he was in San Francisco and saw two young women near a store. He testified that Randi approached him and asked him for money for cigarettes and liquor. Appellant accompanied the women into the store and purchased some liquor for them. He testified that he did not drink hard liquor because he was a diabetic.

Appellant further testified that he left the store with the two young women and drove them to Roxanne's apartment in his pickup. Roxanne and Randi entered the apartment building, then reemerged. Randi voluntarily got into the truck and appellant drove her toward his home, believing that she intended to have sexual relations with him. They drove to appellant's home and got out of the truck. Appellant and Randi kissed in front of his door, but Randi motioned that she did not want to go inside. They then walked down Mission Street, where they saw a pickup parked on the street. Randi got in the pickup with appellant and they resumed kissing. Appellant testified that he had no intention of using force. He believed that Randi was consenting to have sexual intercourse with him. When he tried to pull down her jeans she reacted violently, striking him in the face. They struggled briefly. Appellant left the pickup and returned to his own pickup. As it was dark, he did not notice that she was bleeding. He did, however, discover blood on his clothing later that evening.

Appellant denied trying to evade the police in subsequent weeks. He testified that he had tried unsuccessfully to contact Inspector Williams in response to one of the messages that had been left. He moved from his residence during this period because a group of young men in the neighborhood were harassing him. He lied to the investigators concerning his whereabouts on the night of the incident because he was afraid he "would not get justice."

I.[3]

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

[3]See footnote 1, *ante.*

## II.

### *Great Bodily Injury*

Appellant alleges error in the trial court's refusal of his proposed instruction defining "great bodily injury." The jury was given CALJIC No. 9.03 defining the elements of assault with force likely to produce great bodily injury (§ 245, subd. (a)) as follows: ". . . [I]n order to prove the commission of such crime, each of the following elements must be proved:

"1. That a person was assaulted, and

"2. That the assault was committed by means of force likely to produce great bodily injury.

"As used in this instruction, great bodily injury refers to significant or substantial bodily injury or damage; it does not refer to trivial or insignificant injury or moderate harm. . . ."

Appellant requested the court to further elaborate on the definition of "great bodily injury." He proposed the following instruction: "As used in these instructions the term 'great bodily injury' means a serious impairment of physical condition including but not limited to the following: prolonged loss of consciousness, severe concussion, protracted loss of any bodily member or organ, protracted impairment of function of any bodily member or organ or bone, a wound or wounds requiring extensive suturing, serious disfigurement, or severe physical pain inflicted bu [*sic*] torture. For an injury to constitute 'great bodily injury' it must either be one of the types of damage just described, or it must be of at least the same degree of seriousness as those named."

This proposed instruction is based on language adopted by the Legislature in former section 12022.7. (See Stats. 1976, ch. 1139, § 306, p. 5163.) Before its effective date, however, section 12022.7 was amended to delete the listing of specific examples of injury. Instead, the Legislature adopted a more general definition: ". . . [G]reat bodily injury means a significant or substantial physical injury." (See Stats. 1977, ch. 165, § 94, p. 679.) The instruction given in this case (CALJIC No. 9.03) quotes this more general definition.

Appellant relies on *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274], in which the Supreme Court held that the 1977 amendment to section 12022.7 did not change the level of harm necessary to sustain a finding of great bodily injury. Instead, the court deter-

mined the Legislature changed the language of the statute so that the categories listed in the former statute would not be considered "all inclusive" of great bodily injury. "Great bodily injury" includes injuries of the types specified in the former statute and other injuries "of equal magnitude to [those] categories." (*Id.*, at pp. 581-582.)

Three recent cases have held there is no *sua sponte* duty to instruct on the term "great bodily injury" as that term is used in the charge of assault with a deadly weapon or with force likely to produce great bodily injury (§ 245, subd. (a)). (*People* v. *Miller* (1981) 120 Cal.App.3d 233, 236 [174 Cal.Rptr. 479]; *People* v. *Kimbrel* (1981) 120 Cal.App.3d 869, 876 [174 Cal.Rptr. 816]; *People* v. *Roberts* (1981) 114 Cal.App.3d 960, 964-966 [170 Cal.Rptr. 872].)[4] In these three 1981 cases, no definition of the term "great bodily injury" was given. CALJIC No. 9.03 did not include a definition of the term at that time.

In the present case, the jury was instructed on the statutory definition of "great bodily injury" as it is now included in CALJIC No. 9.03. ■ Appellant argues, however, that upon request, the court should have further defined the term by listing examples in the language of former section 12022.7. We hold that this was not required to adequately instruct the jury.

■ The scope of a court's duty to deliver instructions requested by the defense is greater than its obligation to instruct the jury *sua sponte* on the general principles of law applicable to a case. (*People* v. *Stevenson* (1978) 79 Cal.App.3d 976, 985 [145 Cal.Rptr. 301].) Requested instructions must be delivered "upon every material question upon which there is any evidence deserving of any consideration whatever." (*People* v. *Burns* (1948) 88 Cal.App.2d 867, 871 [200 P.2d 134]; *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Carmen* (1951) 36 Cal.2d 768, 773-774 [228 P.2d 281].) If the instructions are repetitive or are on issues fully covered by other instructions, however, they may properly be refused. (*People* v. *Hall* (1980) 28 Cal.3d 143, 159 [167 Cal.Rptr. 844, 616 P.2d 826]; *People* v. *Kaiser* (1980) 113 Cal.App.3d 754, 766 [170 Cal.Rptr. 62].)

■ The term "great bodily injury" has been used in the law of California for over a century without further definition and the courts have

---

[4]In *People* v. *Miller* the court held that although there is no *sua sponte* duty to define great bodily injury, it was error not to provide "instructional amplification" on this point when specifically requested by the jurors after they began deliberating. (*Id.*, 120 Cal.App.3d at p. 236.)

consistently held that it is not a technical term that requires further elaboration. (*People* v. *Rodrigo* (1886) 69 Cal. 601, 603 [11 P. 481]; *People* v. *Roberts, supra,* 114 Cal.App.3d at p. 962.) As the *Kimbrel* court stated: "We are persuaded by the long acceptance of 'great bodily injury' as a term commonly understandable to jurors that it has not acquired a technical legal definition requiring in the absence of special circumstances a clarifying instruction." (*People* v. *Kimbrel, supra,* 120 Cal.App.3d at p. 876.)[5]

We find no unusual circumstances in this case which require departure from this long-standing rule. The jurors were given the general statutory definition and there is nothing to indicate they had any difficulty with this concept. They indicated they had reached a verdict on the section 245, subdivision (a), count after just an hour and a half of deliberations. They thereafter continued their deliberations on the remaining counts and requested clarifying instructions on other points. They returned after a weekend recess, and continued their deliberations until a mistrial was declared on the remaining counts. Under these circumstances, it seems clear that the jurors would have made an inquiry of the court if they had any question or confusion on the meaning of "great bodily injury."

It should also be noted that the *Caudillo*-type instruction proposed by appellant is based upon section 12022.7, which deals with whether "great bodily injury" is actually inflicted. The present case deals with whether the *force* used was likely to produce "great bodily injury." █ We agree with the court in *People* v. *Roberts,* that an instruction which sets forth examples of great bodily injury may unduly emphasize the injury inflicted, rather than the force employed. (*People* v. *Roberts, supra,* 114 Cal.App.3d at pp. 964-965.) Instructions which draw the jury's attention to injury, which is not an element of section 245, "can obfuscate as well as clarify." (*Ibid.*)

█ The jury in the present case was correctly instructed that "[a]ctual bodily injury is not a necessary element of the crime, but, if such injury is

---

[5]We recognize that the court in *Kimbrel* "commended the proposed [*Caudillo*-type] instruction for general use" and criticized the language of CALJIC No. 9.03: "We agree that the use of standard examples (exemplars) is a useful device by which to flesh out and analogically control the meaning of a general term. *Caudillo* makes them a part of the criteria of great bodily injury. We commend the proposed instruction for general use." (*Id.,* at p. 875.) The *Kimbrel* court went on to criticize the new statutory definition as not "helpful or necessary to the understanding of 'great bodily injury.' The substitution of 'significant' or 'substantial' for 'great,' in the context of bodily injury, makes no gains on meaning. . . . At its worst, it is a misleading refinement which introduces flab for leanness of meaning as with the use of the spongy word 'substantial.'" (*Id.,* at pp. 873-874.) This colorful criticism, while spawning new cases, remains dicta, for the court ultimately held that no definition at all was required to adequately instruct the jury on great bodily injury.

inflicted, its nature and extent are to be considered in connection with all the evidence in determining whether the means used and the manner in which it was used were such that they were likely to produce great bodily injury." We find no error in the trial court's refusal of appellant's additional instruction.

### III.[6]

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV.[10]

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### V.[12]

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### VI.

*Sentencing*

In imposing the upper term of four years imprisonment for the section 245, subdivision (a), conviction the court relied upon five aggravating factors: the victim's youth, her vulnerability due to intoxication, the use of great violence which resulted in harm, facts indicating premeditation and the defendant's service of a prior prison term in Cuba for the attempted murder of his wife. Appellant challenges all but the first of these factors.

■ We find no impropriety in the court's reliance on the circumstances of youth, vulnerability, premeditation, and violence resulting in harm. (Cal. Rules of Court, rule 421 (a)(1), (a)(3), (a)(8), (a)(9).) The victim was 16

---

[6]See footnote 1, *ante.*

[10]See footnote 1, *ante.*

[12]See footnote 1, *ante.*

years old and admittedly had been drinking. Intoxication has been recognized as a circumstance indicating vulnerability (*People* v. *Flores* (1981) 115 Cal.App.3d 924, 927 [171 Cal.Rptr. 777]), and its effects on physical and mental faculties are well known. "Vulnerability means defenseless, unguarded, unprotected . . . ." (*People* v. *Smith* (1979) 94 Cal.App.3d 433, 436 [176 Cal.Rptr. 73].) Appellant's argument that intoxication would indicate vulnerability only in cases of sexual assault is without merit. The court could reasonably infer that Randi's intoxication affected her perception, judgment and reactions, thereby rendering her vulnerable to appellant's assault.

The record also supports the inference that appellant stalked the victim and thus premeditated the assault. He was present in the same store with the victim approximately one hour before he accosted her in an entirely different location.

The court found that the offense "did involve great violence, he did use violence . . . which resulted in harm and threat of great bodily injury." (See Cal. Rules of Court, rule 421(a)(1).) Under the particular facts of this case, the evidence relied upon to support a "threat of great bodily injury" as a factor in aggravation would necessarily be the same evidence used to support the jury's finding that appellant used force likely to produce great bodily injury. Such a dual use of facts is prohibited. (*People* v. *Smith* (1981) 122 Cal.App.3d 581, 586-587 [176 Cal.Rptr. 73].) However, California Rules of Court, rule 421(a)(1) also allows aggravation based upon "great bodily harm." Inasmuch as injury is not an element of the crime proscribed in section 245, subdivision (a), reliance on the bodily harm actually inflicted as a factor in aggravation would not constitute a dual use of facts. The injuries suffered by Randi support the court's determination that appellant "did use violence on this young woman, which resulted in harm. . . ."

The record does not support the court's determination to aggravate appellant's sentence based upon his having served a prior prison term in Cuba. The only evidence of this factor is found in the probation report: "During the interview, the defendant stated to the undersigned officer that in 1968 in Cuba he was committed to one year and two months in state prison for attempting to murder his wife." No further inquiry or verification was made.

Appellant argues that section 668 controls, and that a California court may augment punishment only where the elements of the foreign offense

correspond to a crime punishable under California law.[14] (Cf., *People* v. *Crowson* (1983) 33 Cal.3d 623, 632 [190 Cal.Rptr. 165, 660 P.2d 389], "enhancement [under § 667.5] is only permissible when the elements of the foreign crime, as defined by that jurisdiction's statutory or common law, include all of the elements of the California felony." (Fn. omitted.))

California Rules of Court, rule 421(b)(3), however, states that aggravation is permissible if "[t]he defendant has served prior prison terms whether or not charged or chargeable as an enhancement under section 667.5." Thus, by its terms, rule 421(b)(3) would allow consideration of a prior out-of-state felony conviction regardless of whether the elements of the prior offense were identical to a California felony. (See *People* v. *Petty* (1981) 127 Cal.App.3d 255, 265-266 [179 Cal.Rptr. 413].)

Appellant contends, however, and we agree, that there was no showing that the Cuban proceedings satisfied American constitutional standards. ■ While there is a logical basis, absent some challenge, to presume procedural safeguards for convictions suffered in the United States, such a presumption does not attend convictions from foreign countries where courts are not bound by our federal Constitution.

In *United States* v. *Fleishman* (9th Cir. 1982) 684 F.2d 1329, 1344-1346, cert. den., 459 U.S. 1044 [74 L.Ed.2d 614, 103 S.Ct. 464], the court held that the defendant could challenge the validity of a prior Mexican conviction where it could have an effect on the sentence received for a separate offense committed in this country. (*Id.*, at pp. 1345-1346.) One of the defendants in *Fleishman* had specifically asserted that his prior conviction in Mexico was based upon an admission of the offense made without benefit of counsel and only after infliction of physical torture. (*Id.*, at p. 1345, fn. 21.)

The California Supreme Court has also stated that "an individual may challenge the constitutional validity of a prior conviction whenever it is used as a basis for augmenting punishment." (*In re Rogers* (1980) 28 Cal.3d 429, 433 [169 Cal.Rptr. 222, 619 P.2d 415].) The defendant in *Rogers* successfully challenged the use of a prior conviction by the Community

---

[14]Section 668 provides in full: "Every person who has been convicted in any other state, government, country, or jurisdiction of an offense for which, if committed within this state, such person could have been punished under the laws of this state by imprisonment in a state prison, is punishable for any subsequent crime committed within this state in the manner prescribed by law and to the same extent as if such prior conviction had taken place in a court of this state."

Release Board, in calculating the defendant's determinate sentence, where that prior had been declared unconstitutional by the trial court. "The fact that a prior conviction was sustained in another jurisdiction does not preclude such examination. . . ." (*People* v. *Coffey* (1967) 67 Cal.2d 204, 215 [60 Cal.Rptr. 457, 430 P.2d 15].) " 'To the extent that any State makes its penal sanctions depend in part on the fact of prior convictions elsewhere, necessarily it must assume the burden of meeting attacks on the constitutionality of such prior convictions.' " (*Ibid.*, quoting *United States* v. *Jackson* (2d Cir. 1957) 250 F.2d 349, 355.) ▐ It follows that if California courts are to aggravate or increase a state prison sentence because the defendant has served a prior prison term, the underlying conviction on which that term was served must meet constitutional standards.

▐ *Coffey* also requires that any constitutional attack specify the grounds and be made at the earliest opportunity. (*People* v. *Coffey, supra,* 67 Cal.2d 204, 215.) ▐ In this case the earliest opportunity to attack the prior conviction was at the sentencing hearing. Appellant's trial counsel was apparently unaware of it, having asked the court to mitigate sentence based upon the absence of prior convictions. The district attorney also made no reference to the Cuban conviction in outlining the factors she relied upon to request aggravation. But for the reference in the probation report, apparently the issue would not have been raised.

Appellant's objection to use of the prior conviction on the basis that "it hasn't been substantiated, came solely from the mouth of Mr. LaFargue" and "I don't believe that would be proper use" by the court as a factor in aggravation were sufficient to at least raise the question of its constitutional validity.

The Cuban offense was the sole aggravating circumstance relating to appellant rather than to his offense. While the court noted that it was "only one" of the aggravating factors considered, it also stated that "it is awfully hard to ignore it." We agree with this candid view of the trial court, and we consider that an attempted murder conviction may have been an especially weighty factor due to its seriousness and the fact that it was also a crime of violence against a woman.

We therefore remand the case for resentencing with directions that the trial court may not consider the prior prison term served, pursuant to a Cuban conviction, unless the court first determines its constitutional validity.

The judgment of conviction is affirmed. The cause is remanded to the trial court with directions to conduct resentencing proceedings consistent with this opinion.

Rattigan, Acting P. J., and Poché, J., concurred.

A petition for a rehearing was denied November 2, 1983, and the opinion was modified to read as printed above on November 2 and 3, 1983. Appellant's petition for a hearing by the Supreme Court was denied December 14, 1983.