[No. D026988. Fourth Dist., Div. One. Oct. 29, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON ALBRITTON, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II.C. through VII.

**COUNSEL**

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General,

Janelle M. Boustany and Jean Hume, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

HALLER, J.—A jury convicted Jason Albritton of one count of involuntary manslaughter (Pen. Code,[2] § 192, subd. (b)), a lesser included offense of murder, and one count of assault on a child with force likely to produce great bodily injury resulting in death (§ 273ab). The trial court sentenced Albritton to an indeterminate term of 15 years to life in prison on the child abuse resulting in death count. The court also imposed the upper term of four years for the involuntary manslaughter conviction, but this sentence was stayed pursuant to section 654.

Albritton appeals, attacking his conviction under section 273ab as inconsistent with his involuntary manslaughter conviction and contending section 273ab is unconstitutional. Albritton also contends the trial court made various incorrect evidentiary rulings and committed instructional error with respect to CALJIC No. 2.03. Finally, Albritton claims the prosecutor committed prejudicial misconduct in her closing argument.

## FACTS

Albritton and Kelly McAlindon, who met in 1994 while both were serving on the same Navy ship, developed a romantic relationship and began living together. After McAlindon became pregnant, they moved to a larger apartment. Their daughter, Ashley, was born on March 27, 1995. When McAlindon returned to work, her hours were from 7:30 p.m. to 7:30 a.m. Albritton normally worked from 7 a.m. to 4 p.m., but on occasion had to work 24-hour shifts. Their next-door neighbor babysat for Ashley in her apartment when both McAlindon and Albritton were working at the same time.

On July 3, 1995, McAlindon left for work about 7 p.m. About 8 p.m., Albritton telephoned McAlindon at work and told her that Ashley had fallen off the bed but he had managed to catch her. Later, Albritton phoned McAlindon at work again and told her that he did not know what was wrong with Ashley: "I don't know what to do. Her nose is bleeding and she's not right." About 9:30 p.m., Albritton brought Ashley to a neighbor's apartment downstairs; the infant was not breathing and was bleeding from the nose. Albritton told the neighbors Ashley had drowned. The neighbors attempted to administer CPR (cardiopulmonary resuscitation) on Ashley and called

---

[2]All statutory references are to the Penal Code unless otherwise specified.

911. Ashley had no signs of life when paramedics started working on her. Albritton told a police officer on the scene that Ashley became partially submerged in an infant bathtub.

Paramedics took Ashley to Children's Hospital, where Dr. Marilyn Kaufhold's findings were inconsistent with a history of a near drowning. Among other things, Ashley had retinal hemorrhages and severe brain swelling, conditions not associated with drowning victims but common in babies who have been shaken. Ashley also had new and old subdural hematomas. Kaufhold opined Ashley sustained injuries between 7:30 p.m. and 9:30 p.m. on July 3. Dr. Randall Alexander opined the injuries occurred after 8:30 p.m.

Medical procedures also indicated that Ashley suffered brain hemorrhages before July 3 and a rib fracture between two and three weeks before July 3.

An MRI (magnetic resonance imaging) taken July 6 showed Ashley had cortical necrosis, which means her brain was dying because the blood supply to the brain was not delivering sufficient oxygen. Dr. Melvin Senac, a diagnostic radiologist, opined the cortical necrosis was a result of a recent injury a few days earlier. On July 19, the hospital removed life support and Ashley died shortly thereafter; had she lived it would have been in a vegetative state.

Kaufhold, Alexander and Dr. Christopher Swalwell, a deputy medical examiner, opined Ashley died as a result of shaken baby syndrome.

Albritton told San Diego Police Officer Leland McEuen, the first officer on the scene, that Ashley's head had been submerged in her bathtub and previously Ashley had been "sickly." Albritton also said he had patted Ashley to get her to breathe again.[3] That evening or early the next morning Albritton related essentially the same story to another police officer who responded to the 911 call, as well as to a child abuse detective and a licensed clinical social worker at the hospital. Also, Albritton told McAlindon that he found Ashley partially submerged in water.

During his July 3 interview with Detective Sharon Newberry, the child abuse detective, Albritton said that after Ashley had fallen asleep on his chest in the bathtub, he put her in the infant bathtub with two to three inches of water. When Albritton next looked at the infant bathtub, Ashley had rolled to her side and her mouth was in the water. She was gasping for air when he grabbed her out of the tub. Albritton also said he hit Ashley on the

---

[3]McEuen notified child abuse detectives because Albritton's demeanor was not consistent with that of parents he had encountered in previous distressed baby cases.

bottom and on the back and suctioned her nose with an aspirator, causing Ashley's nose to bleed a little. Newberry did not find any blood, water or mucous in any of the aspirators in the apartment.

On July 4, Albritton and McAlindon met with various hospital officials, including Dr. Bradley Peterson, who told Albritton that Ashley's injuries were not consistent with the history he had given. After Peterson related that Ashley had a fractured rib, Albritton said he had shaken Ashley to try to revive her after he found her in the bathtub.

During a July 6 interview with Newberry at the police station, Albritton said that before the bath Ashley had fallen off the bed. He also said when he put Ashley into the infant bathtub she was crying, but suddenly stopped. Albritton looked at her and "it was like she wasn't there anymore. It wasn't her." Because Ashley was not "breathing right," Albritton shook her up and down gently about three times. When told the injuries were caused by violent shaking, Albritton said he was not sure how hard he shook Ashley because he was in a panic mode.

McAlindon and her mother related incidents when Ashley was crying but stopped after Albritton was in a room alone with the infant.

Friends, relatives and Navy personnel testified Albritton was excited about becoming a father, treated McAlindon and Ashley well, was a peaceful individual and was good with children.

Albritton testified Ashley fell off his bed and landed on her head on the floor. He comforted her and she fell asleep. When Ashley woke up crying, Albritton decided to give her a bath. After the bath, he noticed Ashley was not breathing correctly. Albritton suctioned some mucous from Ashley's nose and tried to give CPR, but she did not respond. Trying to get Ashley to cry, Albritton picked her up and hit her on the back and bottom. He then shook her up and down. Albritton did not remember how hard he shook her, but was certain he did not shake her as hard as one of the doctors demonstrated. When Albritton did not get any response from Ashley, he took her to his neighbors.

Dr. Paul Wolfe, autopsy director at the Veterans Administration's Medical Center in La Jolla, opined Ashley had injuries that were four to six weeks old, and did not die of shaken baby syndrome.

DISCUSSION

## I. *Verdicts Were Not Inconsistent*

Albritton contends the guilty verdict of child abuse resulting in death (§ 273ab) is inconsistent with the guilty verdict of involuntary manslaughter, which was rendered by the jury as a lesser included offense of murder. The contention is without merit.

Murder is the unlawful killing of another human being with malice aforethought. (§ 187.) Malice is either express or implied; express malice is the manifestation of a deliberate intention to kill a fellow human being while implied malice is present when an individual, with wanton disregard for human life, commits an act which involves a high degree of probability it will result in death. (§ 188; *People v. Memro* (1985) 38 Cal.3d 658, 700 [214 Cal.Rptr. 832, 700 P.2d 446].)[4]

"Manslaughter is the unlawful killing of a human being without malice." (§ 192; see CALJIC No. 8.37.) Manslaughter is involuntary when the killing is in the commission of an unlawful act, which is dangerous to human life under the circumstances of its commission, or in the commission of an act, ordinarily lawful, which involves a high degree of risk of death or great bodily harm, without due caution and circumspection. (See CALJIC No. 8.45; *People v. Wells* (1996) 12 Cal.4th 979, 988-989 [50 Cal.Rptr.2d 699, 911 P.2d 1374].) "[T]he only logically permissible construction of section 192 is that an unintentional homicide committed in the course of a noninherently dangerous felony may properly support a conviction of involuntary manslaughter, if that felony is committed without due caution and circumspection." (*People v. Burroughs* (1984) 35 Cal.3d 824, 835 [201 Cal.Rptr. 319, 678 P.2d 894].)

As defined by section 273ab,[5] the crime of child abuse resulting in death occurs when a person who has the care or custody of a child under

---

[4]Under the felony-murder doctrine, a killing whether intentional or unintentional is first degree murder if committed in the perpetration of or attempt to perpetrate certain serious felonies, such as arson, rape, robbery and burglary. (See § 189.) The ordinary elements of first degree murder—malice and premeditation—are eliminated. The only specific criminal intent required is the specific intent to commit the particular felony. "[S]uch a killing is murder of the first degree by force of section 189 . . . ." (*People v. Coefield* (1951) 37 Cal.2d 865, 868 [236 P.2d 570].) The rule is a creature of statute. (*People v. Dillon* (1983) 34 Cal.3d 441, 463, 472 [194 Cal.Rptr. 390, 668 P.2d 697].)

[5]Section 273ab provides: "Any person who, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life. Nothing in this section shall be

eight years of age assaults that child by "means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death."

Thus, there are four elements: "(1) [a] person had the care or custody of a child under eight years of age; (2) [t]hat person committed an assault upon the child; (3) [t]he assault was committed by means of force that to a reasonable person would be likely to produce great bodily injury; and (4) [t]he assault resulted in the death of the child." (CALJIC No. 9.36.5; *People v. Preller* (1997) 54 Cal.App.4th 93, 97-98 [62 Cal.Rptr.2d 507].)

In *People v. Preller, supra,* 54 Cal.App.4th at pages 96 to 98, the Court of Appeal rejected the notion that an element of section 273ab is the use of force that a reasonable person would believe was likely to result in the child's death. The appellate court concluded: "To convict, the jury must determine the child died as a result of the caretaker's assault and a reasonable person would believe the force was likely to result in great bodily injury." (54 Cal.App.4th at p. 97.) We agree with this holding.

■ ·However, Albritton's argument the verdicts are inconsistent is based largely on dicta in *People v. Preller, supra,* 54 Cal.App.4th at pages 97 and 98, in which the Court of Appeal labeled section 273ab as a "murder statute" and stated the Legislature intended it to be a "murder statute." Relying on the *Preller* characterization of section 273ab as a "murder statute," Albritton argues the verdicts of involuntary manslaughter and child abuse resulting in death are inconsistent because in returning the involuntary manslaughter verdict the jury rejected a murder charge. Hence, Albritton argues the section 273ab verdict is inconsistent with the manslaughter verdict and cannot be reconciled with it.

There are at least two problems with Albritton's reliance on the *Preller* "murder statute" language to argue inconsistent verdicts. First, the likening of section 273ab to a "murder statute" in *People v. Preller* is mere dictum; the "murder statute" references were not statements of law necessary to the decision but mere general observations. ■ "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr.

construed as affecting the applicability of subdivision (a) of Section 187 or Section 189." Originally, when the statute was enacted in 1994, it carried a punishment of 15 years to life in the state prison. (Stats. 1994, 1st Ex. Sess. 1993-1994, ch. 47, § 1.) A 1996 amendment increased the penalty to 25 years to life imprisonment. (Stats. 1996, ch. 460, § 2.)

At issue here is the earlier version of the statute, and we do not consider the statute as it was amended in 1996.

377, 393 P.2d 689]; see also *People* v. *Burnick* (1975) 14 Cal.3d 306, 317 [121 Cal.Rptr. 488, 535 P.2d 352] ["cases are not authority for propositions not considered"].)

■ Moreover, the "murder statute" language in *Preller* is at best imprecise because section 273ab does not entail an essential element for murder, namely, malice aforethought. In using the "murder statute" language, the *Preller* court was principally noting the punishment for section 273ab was "commensurate with the punishment for first degree murder." (*People* v. *Preller, supra,* 54 Cal.App.4th at p. 97.)[6] To make this point, the *Preller* court would have been more accurate if it had designated section 273ab as a "homicide statute," which carried the same punishment as first degree murder.

The "murder statute language" of *Preller* does not advance Albritton's inconsistent verdicts argument.

The overwhelming evidence was that Ashley died of shaken baby syndrome and that Albritton was the individual who shook Ashley. Thus, there is ample evidence in the record to justify a jury finding that Albritton did not intend to kill Ashley but caused her death by committing child abuse without due caution and circumspection. Substantial evidence supported the involuntary manslaughter verdict. By the same token, the section 273ab verdict was supported by substantial evidence—namely, Ashley, who was under eight years old, died at the hands of Albritton, a caretaker, who used force that a reasonable person would believe was likely to cause great bodily injury. There was abundant evidence to support both verdicts. The record also shows there was no factual inconsistency in the two verdicts.

## II. *Section 273ab Is Constitutional*

### A. *Vagueness and Overbreadth*

■ Albritton contends section 273ab is unconstitutionally vague and overbroad because it does not define with certainty the conduct it prohibits.

■ To satisfy due process protections, ". . . a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people

---

[6]The *Preller* court also noted that the language of the final sentence of section 273ab— "Nothing in this section shall be construed as affecting the applicability of subdivision (a) of Section 187 . . . or Section 189"—indicated the Legislature intended to make section 273ab "a murder statute." (*People* v. *Preller, supra,* 54 Cal.App.4th at p. 98.) "Under this provision, the prosecution has discretion to charge under the more traditional murder statutes instead of or in addition to charging a violation of section 273ab." (*Ibid.*)

can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." (*Kolender* v. *Lawson* (1983) 461 U.S. 352, 357 [103 S.Ct. 1855, 1858, 75 L.Ed.2d 903].) In other words, due process requires a criminal statute to (1) "be definite enough to provide a standard of conduct for those whose activities are proscribed," and (2) "provide definite guidelines for the police . . . to prevent arbitrary and discriminatory enforcement." (*People* v. *Heitzman* (1994) 9 Cal.4th 189, 199 [37 Cal.Rptr.2d 236, 886 P.2d 1229].)

However, "[t]he starting point of our analysis is 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' [Citation.]" (*Williams* v. *Garcetti* (1993) 5 Cal.4th 561, 568 [20 Cal.Rptr.2d 341, 853 P.2d 507].)

With respect to whether the statute is impermissibly vague, we ask the following question: Does section 273ab provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"? (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108 [92 S.Ct. 2294, 2298-2299, 33 L.Ed.2d 222].)

In determining whether a criminal statute is sufficiently clear to fulfill fair notice requirements, we consider the language of the statute, its legislative history and California decisions construing the statutory language. (*Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 246 [158 Cal.Rptr. 330, 599 P.2d 636].)

Section 273ab, as enacted in 1994 (see fn. 5, *ante*), made it a crime, punishable by a 15-year-to-life term, for a caretaker or custodian of a child under 8 years to assault the child with force that a reasonable person would believe was likely to result in great bodily injury.

On its face, the statute gives explicit notice to individuals "having the care or custody of a child who is under eight years of age" (§ 273ab) that they fall within the purview of the statute. The phrase "care or custody" in section 273ab has no special meaning "beyond the plain meaning of the terms themselves." (*People* v. *Cochran* (1998) 62 Cal.App.4th 826, 832 [73 Cal.Rptr.2d 257].) "The terms 'care or custody' . . . imply . . . only a willingness to assume duties correspondent to the role of a caregiver." (*Ibid.*)

The statute also gives plain notice that the proscribed act is an assault on a child under eight years of age with force that objectively is likely to

produce great bodily injury. Albritton argues the phrase "great bodily injury" is vague because it can cover "a multitude of injuries ranging from a cut lip to broken bones." Not so. The Legislature has supplied the definition of "great bodily injury"; the term means "a significant or substantial physical injury." (See § 12022.7.) As the Court of Appeal in *People* v. *La Fargue* (1983) 147 Cal.App.3d 878, 886-887 [195 Cal.Rptr. 438] stated: "The term 'great bodily injury' has been used in the law of California for over a century without further definition and the courts have consistently held that it is not a technical term that requires further elaboration. [Citations.]"

■ A statute is unconstitutionally overbroad if it prohibits lawful as well as unlawful activity. (*Williams* v. *Garcetti, supra,* 5 Cal.4th at p. 577.) Section 273ab does not criminalize lawful activity.

Section 273ab is neither unconstitutionally vague nor unconstitutionally overbroad. It is not uncertain, arbitrary or unreasonable in defining either the offenders or the offenses to which it applies.

### B. *Statute Is Not Unconstitutional Strict Liability Offense*

■ Albritton contends section 273ab is an "unconstitutional 'strict liability'" statute in which a murder sentence is imposed for an offense without a mental state element.

Albritton is mistaken. A strict liability offense is one which dispenses with a mens rea, scienter or wrongful intent element. (See *People* v. *Simon* (1995) 9 Cal.4th 493, 519-522 [37 Cal.Rptr.2d 278, 886 P.2d 1271].) Section 273ab is a general intent crime. The mens rea for the crime is willfully assaulting a child under eight years of age with force that objectively is likely to result in great bodily injury—that is, the assault must be intentional. Whether the force is objectively likely to result in great bodily injury is a question for the trier of fact. (See *People* v. *Jaramillo* (1979) 98 Cal.App.3d 830, 836 [159 Cal.Rptr. 771].)

As far as mens rea is concerned, section 273ab is analogous to section 245, subdivision (a)(1), which makes it a felony for any person "by any means of force likely to produce great bodily injury" to commit an assault upon another. Section 245, subdivision (a)(1), does not require a specific intent to produce great bodily injury. (*People* v. *Covino* (1980) 100 Cal.App.3d 660, 667-668 [161 Cal.Rptr. 155].) It is a general intent crime. (*People* v. *Martinez* (1973) 31 Cal.App.3d 355, 359 [107 Cal.Rptr. 284].)

As explained by our Supreme Court in *People* v. *Colantuono* (1994) 7 Cal.4th 206, 217 [26 Cal.Rptr.2d 908, 865 P.2d 704]:

" 'The gravamen of the crime defined by . . . section 245 is *the likelihood that the force applied or attempted to be applied* will result in great bodily injury.' [Citation.] The criminal law thus independently sanctions the initiation of force or violence—the 'assault'—because it directly and immediately culminates in injury—the 'battery.' [Citation.] Based on this apposition, each constitutes a discrete offense for which only an intent to commit the proscribed act is required. [Citations.]

"Considered from this perspective, it is clear that the question of intent for assault is determined by the character of the defendant's willful conduct considered in conjunction with its direct and probable consequences. If one commits an act that by its nature will likely result in physical force on another, the particular intention of committing a battery is thereby subsumed. Since the law seeks to prevent such harm irrespective of any actual purpose to cause it, a general criminal intent or willingness to commit the act satisfies the mens rea requirement for assault. 'As Professor Perkins puts it: "Intent includes those consequences which (a) represent the very purpose for which an act is done (regardless of the likelihood of occurrence), or (b) are known to be substantially certain to result (regardless of desire)." ' [Citation.]" (Original italics.)

The same principles apply to the intent element of section 273ab. Only a general criminal intent to commit the proscribed act—assault on a child under eight years old with force that objectively is likely to result in great bodily injury—is required. Whether the intended act in its nature is one likely to produce great bodily harm is a question for the jury. It is not required that the actor intend to produce great bodily injury or death, nor is it required that he know or should know the act is intrinsically capable of causing such consequences.

Albritton complains that he has "in effect been found guilty of murder in the second degree based upon the sentence" required by section 273ab even though the jury found he did not have the mens rea for murder but rather only for involuntary manslaughter. This complaint essentially repeats Albritton's argument that section 273ab is a murder statute, which is an argument that defies traditional legal concepts requiring malice aforethought as an element of murder.

We already have indicated—notwithstanding *People* v. *Preller, supra,* 54 Cal.App.4th 93—that it is a misnomer to call section 273ab a murder statute and it is more akin to a child abuse homicide statute. Albritton has not identified any viable constitutional reason why the state cannot criminalize such conduct and make it a separate crime when the victims are young

children. Considering the purpose of the statute—to protect children at a young age who are particularly vulnerable—there can be no dispute of the gravity of the governmental interest involved. As our Supreme Court put it, it is "an interest of unparalleled significance: the protection of the very lives of California's children, upon whose 'healthy, well-rounded growth . . . into full maturity as citizens' our 'democratic society rests, for its continuance . . . .' " (*Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 139 [253 Cal.Rptr. 1, 763 P.2d 852].)

It is the Legislature's prerogative to define crimes and set punishments for crimes. Given the significant governmental interest involved, we fail to see how the Legislature's decision to impose a severe penalty—even an indeterminate term—for child abuse resulting in death does not pass constitutional muster. No constitutional provision precludes the Legislature from creating a new homicide crime without a malice aforethought element and setting a life imprisonment penalty for the crime. (See fn. 5, *ante.*)

C. *Punishment Is Not Cruel and/or Unusual as Applied\**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

III.-VII.\*

. . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

Affirmed.

Kremer, P. J., and Work, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 17, 1999.

---

\*See footnote 1, *ante*, page 647.