Filed 5/20/15  P. v. Cruz CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D065008 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE309627) |
| DAVID CHRISTOPHER CRUZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.


A jury convicted David Christopher Cruz of second degree murder and assault on a child with force likely to cause great bodily injury resulting in death.  The court

sentenced him to 25 years to life on the assault conviction and stayed his sentence of 15 years to life on the murder conviction.  Cruz appeals, contending (1) the trial court erred in denying his pretrial motion to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), (2) his assault conviction violates due process because the offense does not have a requirement that the defendant know his act could result in death, and (3) the statutory penalty of 25 years to life on his assault conviction violates the equal protection clause of the federal Constitution.  We reject Cruz's arguments and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In early 2011, Cruz began dating Sharika Summers.  Shortly thereafter, Cruz offered to care for Summers's infant son, Cordero Cisneros, Jr., so Summers could save money on daycare.  (Undesignated date references are to the year 2011.)  In March, Summers noticed bruises on Cisneros on multiple occasions.  Summers wondered if Cruz was hurting Cisneros, but she dismissed the thought because Cruz acted liked everything was fine.  According to Summers, Cruz treated Cisneros like his own son.

Later that month, when Cisneros was approximately seven months old, Summers's neighbor saw Cruz outside holding Cisneros.  Cruz was panicking and asking for help.  The neighbor brought Cruz and Cisneros into his apartment and called 911.  The neighbor's mother began performing CPR on Cisneros who was not breathing.  Cisneros had swelling in the arms, chest and head area.  He also had black, purple and green bruises on his legs, face, and chest.

2

San Diego County Sheriff's Deputy Damon Chandler arrived at the neighbor's apartment before paramedics. Cruz was standing outside the apartment and told Deputy Chandler, "'Please help me. I don't know what's wrong with my baby.'" Deputy Chandler observed that Cisneros had "purple blotches" on his face and an abrasion under his chin. Deputy Chandler could not find a pulse on Cisneros and administered CPR until the paramedics arrived.

Deputy Chandler tried to obtain information from Cruz regarding what happened to Cisneros. Cruz said he had given Cisneros formula, some solid baby food, and then put him down for a nap. When Cruz checked on Cisneros two hours later, Cisneros was unresponsive. Cruz stated he administered CPR for approximately 15 minutes.

San Diego County Sheriff's Deputy Janine Alioto also responded to the scene. When she arrived, Deputy Alioto heard Cruz say, "'It's my fault. It's my fault.'" Cruz told her that while he was babysitting Cisneros, he heard a loud crash like shelves falling. Cruz further said that when he went into Cisneros's room, Cisneros was not moving.

While she was at work, Summers received a call about her son. She rushed home to see what happened. When she got there, Cruz ran up to her, got down on his knees, and said, "'I'm sorry, I'm sorry, I'm sorry.'" Cruz told Summers that he was playing a video game in the living room when he heard a crash in Cisneros's room. Cruz stated that when he went in Cisneros's room, Cisneros was lying on his side.

Summers saw Cisneros at the hospital. Cisneros had a large dark mark on his face like somebody had hit him. A doctor informed Summers that Cisneros was brain dead and could not be saved.

3

That same night, deputies arrested Cruz. San Diego County Sheriff's Detective Donnie Sossaman interviewed Cruz at the Sheriff's station. Cruz stated that he got angry when Cisneros would not stop fussing. Cruz snatched Cisneros up and shook him. At that point, Cruz got scared because Cisneros's head snapped back. Cruz also stated that he had hit Cisneros in the stomach, causing Cisneros to fall off the couch and onto the floor. Cruz put Cisneros in his crib and noticed that Cisneros would not sit up. Thus, Cruz attempted to do CPR on Cisneros and slapped him to try to revive him. Cruz admitted to getting mad and shaking Cisneros on three occasions.

An autopsy revealed that Cisneros had numerous bruises and abrasions on his face and body. He had multiple rib fractures that had occurred at different times and factures on the bones between his elbow and wrist. Cisneros also had multiple hemorrhages on the tissues below the surface of his scalp.

The medical examiner classified Cisneros's death as a homicide. He stated the cause of death was brain damage resulting from a lack of oxygen and blood flow to the brain caused by head injury. A defense expert testified that it was possible that Cisneros died from an "ear infection that either spread to the blood and developed sepsis or caused thrombosis of the big vein in the head."

DISCUSSION

I. <em>Denial of Faretta Motion</em>

A. Facts

One month before trial, defense counsel informed the court that Cruz wished to bring a motion for substitution of appointed counsel under *People v. Marsden* (1970) 2

4

Cal.3d 118 (*Marsden*). The trial court conducted a *Marsden* hearing outside the presence of the prosecutor. Cruz complained that defense counsel refused to call a character witness and continuously told him to take a plea deal. Cruz thought defense counsel was not acting in Cruz's best interest. When the court inquired if Cruz had other complaints, Cruz responded, "There's not really much I can say to deter your mind. It seems like your mind is set up that I have a pretty good lawyer, even though I feel otherwise."

Defense counsel responded to Cruz's allegations, explaining that he informed Cruz of the tactical dangers of opening the door to negative character evidence. Defense counsel indicated he conferred with multiple colleagues who all agreed that the defense should not open the door to character evidence. Defense counsel also stated he continued to discuss the possibility of a plea agreement with Cruz because of the mounting evidence against Cruz. Counsel believed a plea deal was in Cruz's best interest based on the charges and evidence in the case.

The trial court denied the *Marsden* motion, explaining that defense counsel was doing a great job and using "Herculean efforts" to represent Cruz. The court stated it did not find any shortcomings in defense counsel's advice to Cruz. Shortly thereafter, defense counsel informed the court that Cruz wanted to address the court about representing himself. Defense counsel stated it was the first time Cruz had made the request.

The court instructed Cruz to fill out an "Acknowledgement Regarding Self-Representation and Waiver of Right to Counsel" pursuant to *People v. Lopez* (1977) 71 Cal.App.3d 568 (*Lopez* waiver). Cruz completed the *Lopez* waiver, stating that he

5

wanted to represent himself and acknowledging the dangers and disadvantages of self-representation.

After receiving Cruz's *Lopez* waiver, the court confirmed with Cruz that this was the first time he was seeking to represent himself and commented the case was two and a half years old. The court then inquired whether Cruz would be ready to proceed with trial at the scheduled date, which was in approximately one month. Cruz stated that he would not be ready to proceed and needed time to research. Cruz agreed with the court that they would be "starting from scratch timewise."

The court denied Cruz's *Faretta* motion, stating, "[N]ow, virtually at the last minute, and certainly comparatively the last minute, the defendant is making a request that he's never made before and he's making it immediately after his request to relieve his attorney was denied which causes [the court] to question whether or not this is an unequivocal request. [The court does not] think that it is. [The court] think[s] it's a result of 'if I can't get rid of this attorney, then I'll represent myself.' That's not unequivocal." The court also found the request was not timely made because the case was two and a half years old, Cruz would not be ready for trial on the date set and Cruz required a continuance of undetermined length.

B. Analysis

Cruz contends the trial court erred in denying his pretrial *Faretta* motion. We disagree.

A criminal defendant has the right under the Sixth Amendment of the federal Constitution to conduct his or her own defense. (*Faretta*, *supra*, 422 U.S. at p. 819;

6

*People v. Jenkins* (2000) 22 Cal.4th 900, 959.) Accordingly, when a defendant voluntarily and intelligently makes a timely, unequivocal assertion of the right to proceed pro se, the court must honor that request regardless of how unwise the decision may seem. (*People v. Windham* (1977) 19 Cal.3d 121, 127-128.) The right to self-representation must be invoked within a reasonable time before the commencement of trial and the trial court should consider the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay that might reasonably be expected to follow the granting of such a motion. (*People v. Marshall* (1996) 13 Cal.4th 799, 827.)

To determine whether the defendant invoked the right to self-representation, we review the entire record, including facts following the *Faretta* ruling, de novo. Even if the trial court denied the request for an improper reason, if the record as a whole establishes the request would properly be denied on other grounds, we will nonetheless affirm the judgment. (*People v. Dent* (2003) 30 Cal.4th 213, 218.)

*1. Timelineness Requirement*

A *Faretta* motion is timely if made "within a reasonable time prior to the commencement of trial." (*People v. Windham*, *supra*, 19 Cal.3d at p. 128; *People v. Clark* (1992) 3 Cal.4th 41, 98-99.) In California, there is no bright-line test for determining the timeliness of a *Faretta* motion. (*People v. Clark*, at p. 99.) However, courts have held that *Faretta* motions with a request for continuance were untimely when made shortly before commencement of trial, subject to the court's discretion. (*People v.*

7

*Frierson* (1991) 53 Cal.3d 730, 740, 742; *People v. Burton* (1989) 48 Cal.3d 843, 853; *People v. Moore* (1988) 47 Cal.3d 63, 78-79; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1205; *People v. Hill* (1983) 148 Cal.App.3d 744, 757; *People v. Ruiz* (1983) 142 Cal.App.3d 780, 784-791; *People v. Morgan* (1980) 101 Cal.App.3d 523, 531; *People v. Hall* (1978) 87 Cal.App.3d 125, 132.)

Here, Cruz made his *Faretta* motion approximately one month prior to trial, an amount of time that was certainly not untimely on its face. However, Cruz stated that he would not be ready to start trial in one month as he needed time to research. He did not offer the court a specific date when he would be ready and agreed with the court that they would be "starting from scratch timewise." At that point, the case was two and a half years old. On this record, we conclude the trial court did not err in denying the *Faretta* motion as granting it would have interfered with the orderly administration of justice.

2. *Unequivocal Requirement*

The requirement that a *Faretta* motion be unequivocal "is necessary in order to protect the courts against clever defendants who attempt to build reversible error into the record by making an equivocal request for self-representation." (*People v. Williams* (2003) 110 Cal.App.4th 1577, 1586.) To determine whether a request was unequivocal, a reviewing court should examine a defendant's words and conduct to decide whether that defendant truly desired to give up counsel and represent himself or herself. (*People v. Marshall* (1997) 15 Cal.4th 1, 25-26 (*Marshall*).) "Equivocation of the right of self-representation may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation, or where such actions

8

are the product of whim or frustration."  (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1002.)

A *Faretta* motion made "in passing anger or frustration" or "to frustrate the orderly administration of justice" is not unequivocal and may be denied.  (*Marshall*, *supra*, 15 Cal.4th at p. 23.)  Moreover, a *Faretta* motion made immediately following an unsuccessful *Marsden* motion may be seen as equivocal if the circumstances show the defendant's true desire was actually different representation and not self-representation. (See *People v. Valdez* (2004) 32 Cal.4th 73, 99 [defendant's single reference to right of self-representation, made immediately following denial of *Marsden* motion, supports conclusion that defendant did not make an unequivocal *Faretta* motion]; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1203-1206 [*Faretta* motion was equivocal where defendant made the motion immediately after the trial court denied his *Marsden* motion and defendant's comments suggested he made the motion because the court would not replace his attorney with a different public defender].)

Here, in light of the totality of the circumstances, Cruz's *Faretta* motion could be seen as equivocal.  He sought self-representation after the trial court denied his *Marsden* motion to substitute appointed counsel.  It was clear that Cruz was frustrated with the court during the *Marsden* hearing.  Even before the court made its ruling, Cruz was perturbed, commenting that the court had already made up its mind and there was nothing he could do to change it.  Cruz's emotional response "'did not demonstrate to a reasonable certainty that he in fact wished to represent himself.'"  (*Marshall*, *supra*, 15 Cal.4th at p. 22.)

9

Cruz's *Lopez* waiver does not convince us that his request was unequivocal. Although he completed the waiver, he did so immediately after the court denied his *Marsden* motion and he expressed frustration with the court. The test of a valid waiver of counsel is not whether the defendant completed a particular form and received specific advisements; rather, the record as a whole must demonstrate that defendant truly desired to represent himself. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1225; *Marshall*, *supra*, 15 Cal.4th at pp. 25-26.) Cruz had never before requested to represent himself and did not renew the motion at any time after the court denied it. (See *People v. Hines* (1997) 15 Cal.4th 997, 1028, [noting that a "self-representation request that was an 'impulsive response' to the trial court's denial of the defendant's motion for substitute counsel and was not renewed at a later court date was not unequivocal"].) Based on the record before us, it appears that Cruz's *Faretta* motion resulted from his "passing anger or frustration." (*People v. Butler* (2009) 47 Cal.4th 814, 825.) Accordingly, we conclude the trial court did not err in denying Cruz's request for self-representation.

## II. *Intent Requirement*

Cruz argues his assault conviction violates due process because the offense does not have a requirement that the defendant know his act could result in death and thus it is an improper strict liability offense. In a related argument, he claims the trial court did not properly instruct the jury because CALCRIM No. 820, the instruction on assault on a child likely to produce great bodily injury resulting in death, did not require the jury to find that he knew or a reasonable person would have known his act was likely to result in death.

Cruz was convicted of assault on a child with force likely to produce great bodily injury resulting in death in violation of Penal Code, section 237ab, subdivision (a) (section 237ab). That statute provides the following: "Any person who, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life." Thus, a violation of section 237ab requires proof that (1) a person had the care or custody of a child under eight years of age; (2) that person committed an assault upon the child; (3) the assault was committed by means of force that to a reasonable person would be likely to produce great bodily injury; and (4) the assault resulted in the death of the child. (*People v. Albritton* (1998) 67 Cal.App.4th 647, 655 (*Albritton*); CALCRIM No. 820.)

In *Albritton*, *supra*, 67 Cal.App.4th 647, this Court rejected the same argument that Cruz makes here, namely that section 237ab is an unconstitutional strict liability offense. We explained that "[s]ection 273ab is a general intent crime. The mens rea for the crime is willfully assaulting a child under eight years of age with force that objectively is likely to result in great bodily injury—that is, the assault must be intentional." (*Albritton*, at p. 658.) We concluded that in order to violate section 273ab, "[o]nly a general criminal intent to commit the proscribed act—assault on a child under eight years old with force that objectively is likely to result in great bodily injury—is required. Whether the intended act in its nature is one likely to produce great bodily harm is a question for the jury. It is not required that the actor intend to produce great

11

bodily injury or death, nor is it required that he know or should know the act is intrinsically capable of causing such consequences." (*Albritton*, at p. 659.)

Cruz asserts that due process requires the offense have a mens rea element associated with the death because the accused faces the same 25 years to life penalty as first degree murder. It is "immaterial that the punishment for a violation of section 273ab is the same as first degree murder. The Legislature exercised its prerogative in selecting the range of punishment, and there is no principle of law that precludes the same punishment for different crimes." (*People v. Norman* (2003) 109 Cal.App.4th 221, 228.)

Cruz also argues that the sentence imposed by section 237ab violates principles of the merger doctrine because it imposes a life sentence for an assault. This argument has no merit. "[The merger doctrine] states a felony-murder conviction cannot be based on an assault resulting in death because such a rule 'would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides.' [Citation.]" (*People v. Norman*, supra, 109 Cal.App.4th at pp. 227-228.) The merger doctrine does not apply in this case because section 237ab "is neither a murder statute nor a felony-murder statute." (*Ibid.*) Further, while Cruz was convicted of second degree murder, that conviction was not based on a felony murder theory; instead, the jury was instructed on express and implied malice. Accordingly, the merger rule does not apply.

Lastly, we reject Cruz's instructional error claim. He contends the jury instructions were incomplete because CALCRIM No. 820 did not include a requirement

12

that he knew or a reasonable person would have known his act would result in death. As we explained, a violation of section 237ab does not require that the defendant knew his act would result in death. CALCRIM No. 820 properly instructs the jury that the People must prove the defendant committed the assault by means of force that to a reasonable person would be likely to produce great bodily injury. In that regard, the instruction requires the jury to find "[w]hen the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in great bodily injury to the child." (CALCRIM No. 820.) No further knowledge element was required. Thus, Cruz's instructional error claim fails.

### III. *Equal Protection*

Cruz argues the statutory penalty of 25 years to life on his assault conviction violates the equal protection clause of the federal Constitution. In particular, he contends offenders like him who commit an assault on a child under eight years old in their care and custody are similarly situated to offenders who commit the same act on anybody else yet receive sentences ranging from probation to four years imprisonment.

The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." A similar requirement appears in the California Constitution, article I, section 7. "Equal protection applies to ensure that persons similarly situated with respect to the legitimate purpose of the law receive like treatment; equal protection does not require identical treatment." (*People v. Basuta* (2001) 94 Cal.App.4th 370, 398 (*Basuta*).)

13

"'"'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.'"'" (*People v. Jeha* (2010) 187 Cal.App.4th 1063, 1073, quoting *People v. McKee* (2010) 47 Cal.4th 1172, 1219.) Even if the challenger can show that the classification differently affects similarly situated groups, "[i]n ordinary equal protection cases not involving suspect classifications or the alleged infringement of a fundamental interest," the classification is upheld unless it bears no rational relationship to a legitimate state purpose. (*Weber v. City Council* (1973) 9 Cal.3d 950, 958-959.)

Cruz recognizes that we rejected a challenge to section 273ab on equal protection grounds in *Basuta*, *supra*, 94 Cal.App.4th at pp. 398-399, but asserts a similar argument in part to preserve the issue for federal review. In *Basuta*, we concluded a defendant convicted of violating section 273ab was not similarly situated to other offenders who murder children. (*Basuta*, at p. 399.) We explained, "[a] violation of section 273ab requires not only an assault on a child that results in death but also that the defendant have care or custody of the child. The element of care and custody in section 273ab creates a meaningful distinction between those committing that offense and murderers. Those who have the care and custody of children not only have a particular responsibility and occupy a position of trust, they are also the persons most likely to kill children." (*Ibid.*) The *Basuta* court further concluded the rational relationship test

14

applied, rather than the strict scrutiny test, and "treating murderers and those who violate section 273ab differently bears a rational relationship to a legitimate state interest." (*Ibid.*)

Similarly to the defendant in *Basuta*, Cruz was not denied equal protection because he is not similarly situated with offenders who commit assaults on others not covered by section 273ab. Cruz was entrusted with the care and custody of his victim. This responsibility and position of trust distinguishes his offense from other assault crimes. In accordance with *Basuta*, Cruz's sentence was rationally related to the legitimate state interest in protecting vulnerable children from caretakers committing such intentional acts. In sum, we are not persuaded by Cruz's equal protection challenge.

DISPOSITION

The judgment is affirmed.

MCINTYRE, J.

WE CONCUR:

MCCONNELL, P. J.

NARES, J.