Filed 3/6/13  P. v. Esquibel CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

PHILIP MARK ESQUIBEL,

     Defendant and Appellant.

E053606

(Super.Ct.No. RIF10002978)

OPINION

APPEAL from the Superior Court of Riverside County.  Thomas Kelly, Judge. (Retired judge of the Santa Cruz Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed as modified.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine Gutierrez and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Philip Mark Esquibel guilty of second degree murder (Pen. Code, § 187, subd. (a), count 1)[1] and assault on a child under eight years of age causing death (§ 273ab, count 2). Defendant was sentenced to an indeterminate term of 25 years to life on count 2, and a stayed 15-year-to-life indeterminate term on count 1.

On appeal, defendant contends (1) his 25-year-to-life sentence for child abuse resulting in death constitutes cruel and unusual punishment under the state and federal Constitutions; (2) the abstract of judgment should be corrected to show $9,176.27 of restitution was awarded to the Restitution Fund;[2] and (3) the judgment must be modified to reflect that defendant receive 575 days of actual presentence custody credits. We agree with the parties that the abstract of judgment and the judgment must be modified, but reject defendant's remaining contention.

I

FACTUAL BACKGROUND

In October 2009, Corina Baublit lived in a one-bedroom apartment with her 31-year-old boyfriend (defendant), his three children (ages 11, 9, & five), and her two children (ages two & four). On October 15, 2009, around 9:00 p.m., Baublit fed her children, put them to bed, and then went to work at a nightclub. Later that evening,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Restitution fines are paid into the Restitution Fund in the State Treasury (Pen. Code, § 1202.4, subd. (e)), which is used to compensate victims for specified "pecuniary losses they suffer as a direct result of criminal acts." (Gov. Code, § 13950, subd. (a).)

2

around 10:30 p.m., defendant called Baublit at the nightclub to tell her that her two-year-old daughter J. was vomiting. J. weighed approximately 24 pounds. Baublit did not leave the nightclub until the end of her shift, arriving home around 2:30 a.m. on October 16. Defendant was sleeping on a couch in the living room, and J. and her sister were sleeping together in the bedroom. J. was covered in vomit and gasping for air, so Baublit bathed J. Baublit then drove J. and her sister to the emergency room (ER) at Riverside Community Hospital (RCH), arriving around 4:00 a.m.

Around 5:50 a.m., J. was treated by an ER doctor. A computerized tomography (CT) scan report of J.'s head showed an occipital skull fracture. Her vital signs were abnormal; she appeared to be in the early stages of shock; and she had a fever and increased heart rate. In addition, her abdomen was distended and tender, and she did not want to be touched in that area. Due to the critical nature of J.'s condition and because J. required a pediatric intensive care unit, the ER doctor at RCH had J. transferred to Loma Linda University Children's Hospital (Loma Linda).

J. arrived at Loma Linda's ER around 8:00 a.m., and was examined by a pediatric ER doctor. The doctor noted that J. had bruises on the left side of her face and over her left ear. J. was initially conscious and responsive and asked for her mother and grandmother; however, within a short time, she became less responsive, stopped talking, and her breathing became shallow. Doctors determined that J. had a perforated bowel, which usually occurs within hours after a sharp, energetic blow to the abdomen. A perforated bowel allows toxic material to leak into the abdomen, and if the toxic material

is not removed, the patient will become septic and die.  J. exhibited signs of sepsis, such as fever, hypertension, and low blood pressure.

J. was taken into surgery around 10:00 a.m.  The doctors found part of her large intestine had a "blow-out perforation," i.e., her bowel had been ripped out of place, and toxic material, consisting of stool and minerals, was floating free in her abdominal cavity.  J.'s bowel had to be removed, and her abdomen was too swollen to be closed with sutures.  Around 12:00 p.m., as J. was being moved from the operating room to the intensive care unit, while they were in the elevator, she "coded," and had to be resuscitated.  The ER doctor stated that she had "lost all of her blood pressure and she was unable to . . . [m]ake blood go to the extremities and the rest of the body, the brain."  J. had to be resuscitated, and she continued to struggle for the next 10 to 12 hours to maintain her vital signs before she died around midnight.

Dr. Amy Young, a forensic pediatrician with a subspecialty in child abuse pediatrics at Loma Linda, examined J. after her abdominal surgery.  Dr. Young noticed that most of J.'s scalp and forehead were swollen.  J. had bruises on her forehead, between her eyes, under her eyes, on and behind her left ear, head, upper arm, hand, abdomen, and shins.  J. also had an occipital bone fracture and a complex skull fracture.  Dr. Young opined that the cause of such an injury would not be by "typical short household falls" such as from a countertop to a tiled floor or falling off a bed, but more likely the result of blunt force impact from a fall from a second story window to concrete, or a major car accident where the child was not restrained properly.  The autopsy photographs of J.'s scalp showed significant bleeding and a hemorrhage into most of the

4

scalp. Dr. Young concluded that J.'s injuries were due to nonaccidental blunt force trauma, which was consistent with child abuse.

Dr. Joseph Cohen, Chief Forensic Pathologist, performed the autopsy of J., which revealed that she had experienced significant multiple blunt force head trauma. The examining coroner believed that J.'s head injuries were recent and had occurred within minutes or hours of each other. J.'s abdominal injury was also the result of blunt force trauma. The coroner determined that J. had to have suffered at least one severe blow to her abdomen, but could have suffered two or three blows within minutes or hours of each other; and that J.'s head and abdominal injuries occurred at or about the same time and within 24 hours from the time she died. The coroner concluded that J. had died from multiple blunt impact injuries to her head and torso. The coroner explained that J.'s perforated bowel had become infected with bacteria, resulting in her becoming septic and going into cardiac arrest. The coroner also opined that J.'s injuries were "too devastating to be compatible with normal existence," and that a single throw of the child would not have produced all of her injuries. The coroner explained that the impact required for the blow would have to be "very, very significant," because perforations of the bowel are rare occurrences.

Riverside Police Department detectives interviewed defendant several times. Defendant initially denied inflicting any injury on J. or beating her. He explained that he had accidentally dropped J. on his weights and she hit her stomach. In a later interview, defendant said he had grabbed J., ran to the bedroom and "tossed her in there," resulting in J. landing on a weight bench and J. hitting her head on the weight bench bar. He then

5

picked J. up and she appeared to be fine so he placed her on the bed. J. started screaming and vomiting all over the bed. He left the bedroom because he did not like the smell of vomit, but sent J.'s sister into the room to lay in bed with J. Defendant said that there was nothing wrong with J. and that she was breathing fine. In his final interview, defendant again stated that he had thrown J. and demonstrated how he threw her. He explained that he had thrown her from the threshold of the bedroom about five feet, like passing a basketball. He further said that J. hit the weight bench, had the wind knocked out of her, and had gasped for air.

II

DISCUSSION

A.    *Cruel and/or Unusual Punishment*

Defendant contends that his mandatory sentence of 25 years to life for child abuse resulting in death (§ 273ab) under the facts of this case constitutes cruel and/or unusual punishment under both the federal and state Constitutions.[3] We disagree.

The Eighth Amendment "prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime." (*Rummel v. Estelle* (1980) 445 U.S. 263, 271 (*Rummel*).) But "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." (*Id*. at p. 272.)

---

[3] Section 273ab, subdivision (a), provides in relevant part: "Any person, having the care or custody of a child who is under eight years of age, who assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life."

6

"A punishment may violate the California Constitution . . . if 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1136 (*Cartwright*), quoting *In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).) The court, in applying this standard, examines the offense and the offender, and it compares the punishment with the penalties for other California offenses and crimes in other jurisdictions. (*Cartwright*, at p. 1136; *Lynch*, at pp. 425-427.)

   1.   California Constitution

Defendant contends that the imposition of a mandatory 25-year-to-life sentence for child abuse resulting in death is unconstitutional, because his "actions amounted to conscious disregard for human life as opposed to an intent to kill," he had a minimal prior record, he was remorseful, and his actions were not violent or vicious as compared to other offenders. But California sentencing statutes "have long withstood constitutional challenge." (*Cartwright*, *supra*, 39 Cal.App.4th at p. 1137.) "Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494 (*Martinez*).)

In determining whether a sentence constitutes cruel or unusual punishment, we first consider the nature of the offense and the offender. (*Martinez*, *supra*, 76 Cal.App.4th at p. 494.) "An examination of the nature of the offense and of the offender, "'with particular regard to the degree of danger both present to society'" is particularly relevant in determining this issue. [Citation.] In assessing the nature of the offense, a

court should consider the circumstance of the particular offense such as the defendant's motive, the way the crime was committed, the extent of his involvement and the consequences of his acts." (*People v. Felix* (2003) 108 Cal.App.4th 994, 1000.) "The nature of the offense is viewed both in the abstract and in the totality of the circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind." (*Martinez*, at p. 494.) However, this "inquiry commences with great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. [Citations.]" (*Ibid*.)

Defendant focuses on the above-noted factor and compares himself favorably to the young defendant in *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*), a case in which the California Supreme Court determined that an indeterminate life sentence for first degree felony murder was excessive, under the facts of the case, and reduced the crime to second degree murder. (*Id*. at p. 489.) The analogy is inapt.

In *Dillon*, a 17-year-old boy entered a marijuana farm with some of his friends, intending to steal some of the crop. Hearing shots, the boy believed that his friends might have been shot. Then, when he was approached by an armed man who was guarding the marijuana, the boy believed that he was about to be shot, panicked and fatally shot the man. (*Dillon*, *supra*, 34 Cal.3d at pp. 451-452, 482-483.) The uncontradicted evidence

8

showed that the boy was unusually immature and childlike and, because of his immaturity, he neither foresaw the risk he was creating nor was he able to extricate himself without panicking. (*Id*. at p. 488.) In addition, he had no prior criminal record. (*Ibid*.) Both the jury and the trial court expressed concern that the sentence was excessive in relation to the boy's moral culpability. (*Id*. at p. 487.) Moreover, none of the boy's compatriots received a prison term. (*Id*. at p. 488.)

Here, the offense of section 273ab applies to children under eight years of age. The victim was only two years old, weighed about 24 pounds, and was a particularly vulnerable victim. Defendant assaulted the helpless, two-year-old toddler when he was 31 years old, while he was living with the victim's mother in the same apartment as the victim. We view the evidence in the light most favorable to the judgment. (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358.) The evidence showed that the victim had suffered multiple, significant injuries while under defendant's care. Defendant was not a young teenager when the offense occurred and he had prior experiences with toddlers; he had three older children of his own. Furthermore, the probation report notes that the victim had healing and healed rib fractures and that doctors had informed law enforcement that the victim appeared to have had previous injuries supporting prior incidents of child abuse. A reasonable inference is that defendant had previously abused the victim and, thus, the abuse here was not merely an isolated incident. There was also evidence to show that defendant had a protective or restraining order issued against him and that he had violated that order, thereby suggesting defendant was a dangerous individual.

9

Additionally, defendant had convictions for petty theft, violating a restraining order, and violation of probation. Even if his criminal record were insignificant, this factor is substantially outweighed by the seriousness of his crime and the circumstances of its commission. (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 17.) Moreover, although the elements of the offense do not require proof of express malice or an intent to kill, as defendant argues, defendant's insensible conduct and use of great bodily force against a defenseless two-year-old toddler caused her to suffer multiple serious injuries and resulted in her death. Unlike the immature young defendant in *Dillon*, defendant foresaw the risk he was creating by abusing and/or throwing a small toddler from afar onto a weight bench after being frustrated by her crying.

Having reviewed the nature of the offense and the offender, and considered defendant's arguments, we cannot say a sentence of 25 years to life "is so disproportionate to the crime . . . that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424.)

Moreover, defendant's sentence is not disproportionate when compared to the penalty for child abuse resulting in death with penalties for other serious crimes in California. (See *People v. Crooks* (1997) 55 Cal.App.4th 797, 807-808 [comparing penalty for burglary with intent to commit rape to penalties for kidnapping for ransom (§ 209, subd. (a)) and train wrecking, which provide for life without the possibility of parole (§ 218)].) In fact, appellate courts have upheld the constitutionality of mandatory sentences ranging from 25 years to life to life without the possibility of parole for offenses that do *not* result in death. (*In re Maston* (1973) 33 Cal.App.3d 559, 565 [life

10

without the possibility of parole for aggravated kidnapping where the victim was injured but not killed is not cruel and unusual punishment]; *Crooks*, at p. 808 [25-year-to-life sentence for aggravated rape, with no prior felonies and no great bodily injury, was not disproportionate to other serious crimes]; *People v. Estrada* (1997) 57 Cal.App.4th 1270, 1281-1282 [25-year-to-life sentence under § 667.61 for one forcible rape during a burglary, without the use of a weapon and with no prior felonies, was not cruel and unusual punishment].)

Defendant attempts to argue that he was less culpable than a defendant convicted of first degree murder or an aggravated sex offense, but received an equal punishment for assaulting a child causing her death under section 273ab. However, "[i]t is the Legislature's prerogative to define crimes and set punishments for crimes. Given the significant governmental interest involved, we fail to see how the Legislature's decision to impose a severe penalty—even an indeterminate term—for child abuse resulting in death does not pass constitutional muster. No constitutional provision precludes the Legislature from creating a new homicide crime without a malice aforethought element and setting a life imprisonment penalty for the crime." (*People v. Albritton* (1998) 67 Cal.App.4th 647, 660.)

Additionally, other jurisdictions have upheld sentences equal to or greater than defendant's term for crimes less serious than the death of a defenseless, vulnerable child under the age of eight years, who was in defendant's care. (See *People v. Cisneros* (Colo. 1993) 855 P.2d 822, 830 [life with the possibility of parole after 40 years is not cruel and unusual punishment for possession and sale of drugs with priors of sales of

11

narcotics, menacing with a knife, and violation of bail conditions]; *Edwards v. Butler* (5th Cir. 1989) 882 F.2d 160, 167 [sentence of life without the possibility of parole for one aggravated rape does not violate the 8th Amend.]; *Gibson v. State* (Fla. 1998) 721 So.2d 363, 369-370 [mandatory life sentence without possibility of parole for sexual battery of a minor where defendant had no prior record was not cruel or unusual].)

Even if we acknowledge that differences exist between California's statute and those in child homicide statutes in other states, nonetheless, a review of the statutes reveals no great disparity between California's punishment and that generally imposed in other jurisdictions; generally, the other jurisdictions likewise impose lengthy prison terms for similar offenses. Further, even if California statutes impose the longest sentence in the nation for the offense of child abuse resulting in death of the child, it does not mean that defendant's punishment is cruel and unusual. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.) California is not required to conform its Penal Code to either the majority rule or "'the least common denominator of penalties nationwide.'" (*Ibid*.)

Based on the totality of circumstances here, we are persuaded that the extreme seriousness associated with the offense negates defendant's claim of cruel and unusual punishment. Defendant assaulted a vulnerable, two-year-old toddler, who was his girlfriend's daughter and in his care. The Legislature implemented these types of statutes to protect young children from people who assault such young victims resulting in the death. (*People v. Albritton*, *supra*, 67 Cal.App.4th at p. 660 [the protection of children's lives is "'AN INTEREST OF UNPARALLELED SIGNIFIGANCE'"].)

12

We conclude defendant's sentence is not so disproportionate "'as to shock the conscience and offend fundamental notions of human dignity.' [Citation.]" (*People v. Cline* (1998) 60 Cal.App.4th 1327, 1338 [Fourth Dist., Div. Two].)

### 2. Federal Standard

Defendant fares no better under the federal standard. The hurdles defendant must surmount to demonstrate cruel and unusual punishment under the federal Constitution are, if anything, higher than under the state Constitution. (See generally *People v. Cooper* (1996) 43 Cal.App.4th 815, 819-824, and cases cited.) Strict proportionality between crime and punishment is not required. "'Rather, [the Eighth Amendment] forbids only extreme sentences that are "grossly disproportionate" to the crime.'" (*Cartwright*, *supra*, 39 Cal.App.4th at p. 1135; see also *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 (*Harmelin*).)

In *Rummel*, *supra*, 445 U.S. 263, the United States Supreme Court rejected an Eighth Amendment challenge to a life sentence based on the defendant's conviction of credit card fraud of $80, passing a $28.36 forged check, and obtaining $120.75 by false pretenses. (*Rummel*, at pp. 268-286.) Additionally, in *Harmelin*, *supra*, 501 U.S. 957, the high court ruled that a mandatory sentence of life without the possibility of parole for possession of 672 grams of cocaine did not violate the Eighth Amendment. (*Harmelin*, at pp. 990, 995.) By contrast, what defendant did was far worse than all the crimes committed by *Rummel* and *Harmelin* combined.

In addition, the United States Supreme Court has upheld statutory schemes that result in life imprisonment for recidivists upon a third conviction for a nonviolent felony

13

in the face of challenges that such sentences violate the federal constitutional prohibition against cruel and unusual punishment. (See *Ewing v. California* (2003) 538 U.S. 11, 18, 30-31 [25-year-to-life sentence under three strikes law for theft of three golf clubs worth $399 apiece]; *Lockyer v. Andrade* (2003) 538 U.S. 63 [two consecutive 25-year-to-life terms for two separate thefts of approximately $150 worth of videotapes].)

The protection afforded by the Eighth Amendment is narrow. It applies only in the "'exceedingly rare'" and "'extreme'" case. (*Ewing v. California*, *supra*, 538 U.S. at p. 21.) We are not convinced this is such a case. The mandatory 25-year-to-life sentence imposed is noteworthy. However, defendant's crime is also noteworthy. He used great bodily force against a defenseless, two-year-old toddler, causing her to suffer multiple serious injuries and resulting in her death. Defendant's assault against one of the most vulnerable members of our society fully supports the lengthy sentence that was imposed. Defendant cites no persuasive authority to support his claim that this is one of those rare cases in which a sentence is so grossly disproportionate to the gravity of the offense that it violates the Eighth Amendment's proscription against cruel and unusual punishment.

Accordingly, we conclude this is not the exceedingly rare and extreme case that violates the federal Constitution.

B.      *Abstract of Judgment*

Defendant also argues, and the People correctly concede, that the abstract of judgment should be amended to reflect that $9,176.27 awarded in restitution should be paid to the Restitution Fund and not to any victim. We agree.

14

At the time of sentencing, the People requested that defendant be ordered to pay $9,176.27 to the California Victim Compensation and Government Claims Board. The trial court agreed and ordered defendant to pay $9,176.27 "restitution to be made to the extent that the victim received assistance—and she did—in that amount from the California Victim Compensation and Government Claims Board. So that's to be repaid."[4] The abstract of judgment, however, indicates $9,176.27 in restitution is to be awarded to the "victim(s)."

The trial court's oral pronouncement of sentence prevails over minute orders and the abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Clerical errors can and should be corrected at any time. (*Id*. at pp. 185-187.) We have the inherent power to correct errors to make records reflect the true facts. (*Id*. at p. 185.) The abstract of judgment should therefore be corrected accordingly.

C.  *Presentence Custody Credits*

Defendant further argues that the trial court erred in failing to calculate his presentence custody credits and, therefore, claims the judgment must be modified to reflect 575 days of actual presentence custody credits. The People agree that the judgment should be modified to reflect that defendant received 575 actual days of presentence custody credits.

---

**4** We note that the California Victim Compensation and Government Claims Board processes applications for compensation from the Restitution Fund. (See Gov. Code, § 13950 et seq.)

The California Supreme Court has stated: "'[T]he court imposing a sentence' has responsibility to calculate the exact number of days the defendant has been in custody 'prior to sentencing,' add applicable good behavior credits earned pursuant to section 4019, and reflect the total in the abstract of judgment. (§ 2900.5, subd. (d) . . . .)" (*People v. Buckhalter* (2001) 26 Cal.4th 20, 30.)

Here, at the time of sentencing, the trial court noted, "Defendant does have 575 actual days credit. The law does not give conduct credits, given the nature of the charges. So that's the amount of incarceration." However, neither the May 13, 2011, sentencing hearing minute order nor the abstract of judgment reflect that defendant was awarded any presentence custody credits. Although not clearly stated, it appears that the trial court impliedly awarded defendant 575 days of actual presentence custody credits at the time of oral pronouncement, and the parties do not dispute this amount. For the sake of judicial economy, we will modify the judgment accordingly, and order the trial court's minute order of the sentencing hearing and the abstract of judgment corrected.

III

DISPOSITION

The judgment is modified to award defendant 575 days of presentence custody credits. The superior court clerk is directed to amend the May 13, 2011, sentencing hearing minute order and the abstract of judgment to show (1) that defendant earned 575 days of presentence custody credits and (2) that defendant pay $9,176.27 to the Restitution Fund. The superior court clerk is also directed to forward a certified copy of

16

the amended abstract of judgment and minute order to the Department of Corrections and Rehabilitation.  (§§ 1213, 1216.)  The judgment as thus modified is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

RICHLI
J.

MILLER
J.

17