Filed 3/4/21  P. v. Cole CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B302161 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA464788) |
| v. | |
| PETER COLE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Ronald S. Coen, Judge.  Affirmed.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, William H. Shin and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

# I.   INTRODUCTION

A jury found defendant Peter Cole guilty of deliberate, premeditated attempted murder and found true the allegation that he personally used and discharged a firearm causing great bodily injury.  On appeal, defendant contends that the trial court erred by failing to instruct the jury sua sponte on the definition of great bodily injury.  Defendant also contends that his trial counsel rendered ineffective assistance by failing to request a pinpoint instruction that advised the jury it could consider provocation when determining whether the attempted murder was deliberate and premeditated.  We affirm.

# II.   FACTUAL BACKGROUND

On January 9, 2017, at approximately 10:25 p.m., the victim, D.H., was outside a liquor store on the corner of Western and Vernon Avenues with a fellow Rolling 40s gang member.[1] The liquor store was located in the heart of Rolling 40s gang territory.

Defendant was a member of the Black P Stones, a Bloods gang and rival of the Rolling 40s, a Crips gang.  He had numerous gang tattoos on his face and body, including tattoos that demonstrated his animosity toward his gang's rivals.  For instance, on his left arm, defendant had a tattoo of a gang symbol associated with the Rolling 40s that was crossed out, which

---

[1]    The victim admitted that he was a Rolling 40s gang member and that he had Rolling 40s tattoos.  He did not want to testify at trial and was brought to court against his will from prison.

meant "Kill a 40." On his right arm, he had a tattoo of a crossed-out crab. "Crab" was a derogatory term for a Crip, and, in gang culture, the tattoo meant "Killing a Crab" or "Killing a Crip." On that same arm, he had another tattoo that stated, more directly, "Fuck Crabs." On his face, defendant had a tattoo over each eyebrow: one stated "Black" with an "x" over the "c" and the other stated "Stone." The "x" over the "c" was a gang symbol for "Crip Killer."

On the night of the shooting, defendant was the rear passenger in a Toyota Scion. The driver, A.N., and front passenger, C.H., were also Black P Stone members. When the Scion drove by the victim's location on Western, the victim threw what appeared to be a derogatory gang sign[2] at the Scion.

The Scion turned right onto Vernon and stopped in the middle of the street. Defendant got out of the rear passenger door carrying a black semi-automatic handgun and walked toward the victim. When the victim saw defendant approach, he and his companion turned and ran north on Western. Defendant shot at the victim as he fled, hitting him in the right side of his head and above his right hip.[3]

---

[2] The prosecution's gang expert testified on cross-examination that throwing a gang sign to a rival gang member was a provocative act, in the nature of a challenge, towards the rival.

[3] The victim described his injuries as a "skipped" or "skinned" wound to his head and a "through and through" wound to his side from which he felt "a little burning." An officer who arrived at the scene observed blood coming from a graze wound to the right side of the victim's head and from a gunshot wound to the right side of his hip.

The night of the shooting, at approximately 10:25 p.m., two Los Angeles Police Officers were parked in an unmarked police car on a side street near the intersection of Vernon and Western. When they heard four or five gunshots west of their location, they drove toward the intersection of Vernon and Western. They reached the intersection a few seconds later and were flagged down by citizens who reported that a vehicle driving away from that location westbound on Vernon had been involved in a shooting.

The officers observed that a dark-colored Scion "was the only vehicle driving westbound [on Vernon] at the time." They followed the Scion for "a couple of minutes," and were then joined by a patrol vehicle that took over the lead position in what became a pursuit. When the pursuit came to an end in Black P Stones territory, the officers saw defendant get out of the rear passenger door of the Scion. The officers pursued defendant and apprehended him. They found a .22 caliber handgun on defendant's person and a .22 caliber round in his sock.

Following the shooting, the victim continued northbound on Western to a shop nearby. Once inside, he sat down, saw blood, and realized that he had been shot. Someone in the shop called 911.

Police officers responded to the 911 call and observed paramedics treating the victim, who was then transported to a hospital. The uncooperative victim would not identify his shooter to police, but told them that he heard six gunshots, had pain in his head, and felt light-headed.[4]

---

[4] Photographs taken of the victim while he was in the hospital depicted him grimacing in apparent pain, with a bleeding head wound that covered half of his face in blood, and a

During an interview by Los Angeles Police Department Detective Richard Campos the day after the shooting,[5] defendant admitted that he shot the victim, whom he knew from jail. In describing his prior interaction with the victim, defendant explained, "I beat him up in jail." According to defendant, on the evening of the shooting, he "got into an argument with [his] girl[friend]," and he called his "brother," C.H., to pick him up. C.H. arrived in a Scion driven by A.N. and picked up defendant. As they drove, defendant was "doing coke" and "smoking weed" in the back seat. Defendant was "flamed up because [his] girl[friend]" "kicked [him] out" and he did not "know where [he was] going to lay [his] head."

Defendant went to visit another female friend, who lived on Van Ness. He then wanted to return to his neighborhood and told his companions not to drive "through the enemies," i.e., rival gang territory, because he was on drugs and "wasn't thinking straight all the way." He was "chillin" in the back seat when his companions proceeded toward Vernon and Western, in Rolling 40s gang territory. Defendant admitted that they drove past an unmarked police car in that vicinity but believed that it "was long gone" by the time of the shooting.

As the Scion turned from Western onto Vernon, defendant heard the victim make a derogatory comment about the Black P

---

bullet wound above his right hip that punctured the skin and caused some bleeding.

At trial, the victim testified that defendant was not the shooter.

[5] A video recording of the interview was played for the jury and a transcription of the interview was marked as Exhibit 43.

Stones. The Scion's driver stopped the car, defendant "just bounced out," and he started shooting until the gun's clip was empty. Defendant claimed that the shooting was not planned; "[i]t just happened." Defendant also admitted that the gun was his.

## III.   PROCEDURAL BACKGROUND

In an information, the Los Angeles County District Attorney charged defendant in count 1 with attempted murder in violation of Penal Code[6] sections 664 and 187, subdivision (a).[7] The District Attorney alleged that the attempted murder was committed willfully, deliberately, and with premeditation within the meaning of section 664, subdivision (a). The District Attorney also alleged, among other firearm enhancements, that in the commission of count 1 defendant personally and intentionally discharged a handgun, causing great bodily injury to the victim within the meaning of section 12022.53, subdivision (d). And, the District Attorney alleged as to all counts that they were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(1)(C).

---

[6]     All further statutory references are to the Penal Code.

[7]     Defendant was also charged in counts 2 and 3 with second degree robbery in violation of section 211 based on an incident against two other victims two days prior to the attempted murder.

The jury found defendant guilty on count 1[8] and found true the allegation that the attempted murder was committed willfully, deliberately, and with premeditation.  In addition, the jury found true the allegation that defendant personally and intentionally discharged a handgun causing great bodily injury to the victim.[9]

The trial court sentenced defendant on count 1 to life, with a minimum parole eligibility term of 15 years, plus an additional 25-years-to-life term based on the true finding under section 12022.53, subdivision (d).

## IV.  DISCUSSION

A. *Duty to Instruct on Meaning of Great Bodily Injury*

Defendant contends that the term great bodily injury, as used in section 12022.53, subdivision (d), had a technical meaning particular to the law which should have been explained to the jury as part of the court's instruction on the elements of that firearm enhancement.  Because the court failed to define the term for the jury, using the definition in section 12022.7, subdivision (f) or an equivalent,[10] defendant concludes that the prosecution was relieved of its burden of proving each element of

---

[8]     The jury also found defendant guilty on counts 2 and 3.

[9]     The jury also found true the other firearm allegations and the gang allegations.

[10]     Section 12022.7, subdivision (f) provides:  "As used in this section, 'great bodily injury' means a significant or substantial physical injury."

7

the section 12022.53, subdivision (d) enhancement, including that the victim suffered the requisite great bodily injury.

### 1. Background

On the section 12022.53, subdivision (d) enhancement, the trial court instructed the jury using a modified form of the CALJIC No. 17.19.5 pattern instruction,[11] but in doing so, the court did not give the bracketed definition of the term "great bodily injury" that is included in the pattern instruction. Defendant, however, did not request that the definition be included in the court's instruction or otherwise suggest that the term "great bodily injury" had a technical legal meaning that must be explained to the jury.

### 2. Analysis

"In a criminal case, a trial court has a duty to instruct the jury on """"the general principles of law relevant to the issues raised by the evidence."""" (*People v. Kimble* (1988) 44 Cal.3d 480, 503 . . . .) The 'general principles of law governing the case' are

---

[11] The CALJIC No. 17.19.5 pattern instruction provides, in pertinent part: "If you find the defendant[s] guilty of [one or more of] the crime[s] thus charged, you must determine whether the defendant[s] intentionally and personally discharged a firearm [and [proximately] caused [great bodily injury] [or] [death] to a person] [other than an accomplice] in the commission of [that] [those] [felony] [felonies]. [¶] . . . [¶] [*The term 'great bodily injury' means a significant or substantial physical injury. Minor, trivial or moderate injuries do not constitute great bodily injury*.]" (Italics added.)

those principles connected with the evidence and which are necessary for the jury's understanding of the case.  (*Ibid*.; *People v. Wickersham* (1982) 32 Cal.3d 307, 323 . . . .)  As to pertinent matters falling outside the definition of a 'general principle of law governing the case,' it is 'defendant's obligation to request any clarifying or amplifying instruction.' (*People v. Kimble, supra*, 44 Cal.3d at p. 503.)" (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*).)  And, although the court must define technical terms that have meanings peculiar to the law, there is no duty to amplify or clarify commonly understood words used in jury instructions.  (*Ibid*. ["When a word or phrase "'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.'" [Citations.]  A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning.  [Citation.]"].)

On the issue of whether the term "great bodily injury" has acquired a technical, legal meaning, our Supreme Court in *People v. Escobar* (1992) 3 Cal.4th 740 (*Escobar*) has observed:  "'The term "great bodily injury" has been used in the law of California for over a century without further definition and the courts have consistently held that it is not a technical term that requires further elaboration.  [Citations.].'" (*Id*. at p. 750, fn. 3, quoting *People v. La Fargue* (1983) 147 Cal.App.3d 878, 886–887.)

A decade before the Supreme Court's observation in *Escobar, supra*, 3 Cal.4th 740, the court in *People v. Kimbrel* (1981) 120 Cal.App.3d 869 (*Kimbrel*), expressly rejected the notion that the term great bodily injury had a technical legal meaning that required a clarifying definition.  In that case, the

9

defendant appealed from his conviction for assault with a deadly weapon in violation of section 245, subdivision (a). (*Kimbrel, supra*, 120 Cal.App.3d at p. 870.) Because the trial court instructed the jury that a "'deadly weapon'" was "'any object, instrument, or weapon which is used in such a manner as to be capable of producing, and likely to produce, death or great bodily injury,'" the defendant contended that the court erred in not defining "'great bodily injury'" sua sponte. (*Ibid*.) According to the defendant, the term "'great bodily injury'" had acquired "a restrictive technical legal meaning of which the jury was not apprised," and therefore "either the omitted [former] CALJIC [No. 9.03[12]] definition or a definition modeled on former [ ] section 12022.7[13] should have been given." (*Kimbrel, supra*, 120 Cal.App.3d at p. 872.)

The court in *Kimbrel, supra*, 120 Cal.App.3d 869, rejected the assertion that the term great bodily injury required the further definition suggested by the defendant. According to the court, "[t]he substitution of 'significant' or 'substantial' for 'great,'

---

[12]   According to the court in *Kimbrel, supra*, 120 Cal.App.3d 869, former CALJIC No. 903 "define[d] great bodily injury as a 'significant or substantial bodily injury or damage; it does not refer to trivial or insignificant injury or moderate harm.'" (*Id*. at p. 873, fn. omitted.)

[13]   The court in *Kimbrel, supra*, 120 Cal.App.3d 869 explained that former section 12022.7 defined "great bodily injury" by using examples "representing generalized instances of great bodily injury" that were included within that term. (*Id*. at p. 874–875.) But, as noted in *Kimbrel*, section 12022.7 was thereafter modified to define great bodily injury simply as "'a significant or substantial physical injury.'" (*Id*. at p. 873, fn. 2.)

in the context of bodily injury, makes no gains on meaning" and "the attempted negative definition of great bodily injury as 'not [referring] to trivial or insignificant injury or moderate harm'" was misleading because "[n]ot every nontrivial or insignificant or nonmoderate injury is 'great.'" (*Id.* at pp. 873–874.)

The court in *Kimbrel, supra*, 120 Cal.App.3d 869 therefore concluded: "We are persuaded by the long acceptance of 'great bodily injury' as a term commonly understandable to jurors that it has not acquired a technical legal definition requiring in the absence of special circumstances a clarifying instruction." (*Id.* at p. 876.)

Given the Supreme Court's observation in *Escobar, supra*, 3 Cal.4th 740—that great bodily injury is not a technical term requiring further elaboration—and the long-standing holding in *Kimbrel, supra*, 120 Cal.App.3d 869 to that same effect, we conclude that the trial court did not have a sua sponte duty to define that term further as now suggested by defendant. If, as defendant contends, a further definition was required in this case due to the lack of evidence regarding the severity of the victim's wounds,[14] it was incumbent upon his trial counsel to request a

_____

[14] Although he concedes in a footnote that a "through and through" gunshot wound may constitute great bodily injury, citing *People v. Le* (2006) 137 Cal.App.4th 54, 59–60, defendant nevertheless maintains that case is distinguishable because there is no evidence that the victim here was disabled following his injury. We are not persuaded that the evidence showing the severity of the victim's wounds was insubstantial. The photos of the victim's head and side graphically depict the nature and severity of the wounds. And, the victim testified that he was bleeding, his head hurt, his side burned, and he felt light-headed. Given that evidence, there is no reasonable likelihood that the

11

clarification or amplification of the term specifically tailored to the facts of this case. His failure to do so therefore forfeited the contention on appeal. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051 ["'When, as here, a phrase "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law,"'" and the "defendant believe[s] the instruction [is] incomplete or misleading, he 'ha[s] the obligation to request clarifying language'"].)

In his opening brief, defendant cites to, but does not address, the Supreme Court's observations in *Escobar, supra*, 3 Cal.4th 740, and does not mention *Kimbrel, supra*, 120 Cal.App.4th 869.[15] In his reply brief, defendant attempts to

jury would have returned a different finding on the great bodily injury enhancement if it had been instructed with the definition urged by defendant.

[15] The cases cited in defendant's opening brief are inapposite. For instance, he cites *People v. Clark* (1997) 55 Cal.App.4th 709 (*Clark*) as holding that a court's "failure to define great bodily injury was error." In *Clark,* the court concluded that the trial court erred in failing to deliver "CALJIC No. 17.20 or any equivalent instruction setting forth *the elements* of infliction of great bodily injury for purposes of [ ] section 12022.7." (*Clark, supra*, 55 Cal.App.4th at pp. 713–714, fn. omitted and italics added.) It did not hold that the trial court erred in failing to define "great bodily injury" and indeed the court, in defining assault with a deadly weapon by means of force likely to produce great bodily harm, instructed the jury that "'[g]reat bodily injury refers to significant or substantial bodily injury or damage; it does not refer to trivial or insignificant injury or moderate harm,'" which is almost identical to the instruction that defendant contends on appeal the trial court was required to deliver. (*Clark, supra*, 55 Cal.App.4th at p. 714.)

12

distinguish these cases as arising in different contexts, such that they are not persuasive authority for the issue on appeal. But there is nothing about the context of either case that suggests those courts were interpreting the term great bodily injury in a manner that differed significantly from its use in this case.

B.    *Ineffective Assistance of Counsel*

On the attempted murder charge, defendant contends that he received ineffective legal assistance because his trial counsel failed to request a pinpoint instruction, similar to CALJIC No. 8.73, advising the jury that it could consider provocation when determining whether he acted with deliberation and premeditation. According to defendant, because his trial counsel apparently was unaware that evidence of provocation could negate an inference that he acted with deliberation and premeditation, his failure to request an instruction on that issue fell below the objective standard of reasonableness under prevailing professional norms.

1.    Background

At trial, the prosecution introduced the video of defendant's interview with Detective Campos during which defendant claimed that he was angry the night of the shooting because he had a fight with his girlfriend and that he was also using drugs. Defendant further maintained that the shooting was not planned, asserting instead that it "just happened" when he heard the victim's derogatory remark about the Black P Stones. And, his trial counsel elicited testimony from the gang expert confirming

13

that a derogatory hand gesture, like the one the victim threw at the Scion that night, would have been a provocative act, in the nature of a challenge, to the rival gang members in that vehicle.

During the jury instruction conference held prior to the close of testimony, defense counsel requested, in connection with the attempted murder count, a lesser included instruction on attempted voluntary manslaughter based on the evidence of "heat of passion." The trial court tentatively denied the request, pending the completion of testimony.

After the close of evidence, defense counsel renewed his request for a lesser included instruction on attempted voluntary manslaughter. According to defense counsel, the gang expert's completed testimony about the derogatory comment and hand gesture made by the victim supported an inference that defendant was provoked to act, such that he could not have formed the specific intent to kill necessary for attempted murder. The trial court, however, disagreed that the expert's testimony supported a lesser included instruction on attempted manslaughter. Specifically, the court concluded that "[t]here is insufficient evidence of adequate provocation warranting attempted voluntary manslaughter." It therefore denied the renewed request.

2.    Analysis

"A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) include the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy

14

this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different . . . .  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.  [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Based on the record before us, we cannot conclude that there was no satisfactory explanation for counsel's failure to request a pinpoint instruction advising the jury that it could consider the evidence of provocation on the issue of premeditation.  Indeed, the decision on which jury instructions to request is an inherently tactical choice to be made by counsel. (*People v. Padilla* (2002) 98 Cal.App.4th 127, 137.)  Here, the trial court instructed the jury on general principals of law, including attempted murder (CALJIC No. 8.66) and premeditation and deliberation (CALJIC No. 8.67).  Defendant does not claim that the instructions given were incorrect or misleading.  Thus, counsel could have reasonably concluded that the instructions, which correctly stated the law, were adequate to address the issue of defendant's intent, namely, that he acted without premeditation and deliberation.

Counsel also may have reasonably refrained from requesting an instruction on provocation because it was inconsistent with defendant's trial strategy, which was to argue that the prosecution failed to prove the charges beyond a reasonable doubt. During closing argument, counsel did not argue that defendant acted without premeditation or deliberation because he had been provoked, but instead highlighted the weak eyewitness testimony linking him to the crime by pointing out that two of the officers who participated in his arrest claimed that the person who fled from the Scion was wearing a white shirt when defendant wore a black shirt at the time of his arrest. Counsel also noted that the victim testified defendant was not the shooter.

In addition, counsel may have reasonably concluded that the evidence of provocation was relatively weak, such that a jury instruction on provocation to negate premeditation and deliberation was not warranted. Defendant's claim of provocation relied heavily on defendant's statement to the police that he had fought with his girlfriend and that the shooting occurred after the victim made a derogatory statement about the Black P Stones. (*See People v. Enraca* (2012) 53 Cal.4th 735, 759 ["we have rejected arguments that insults or gang-related challenges would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter"].) Yet in that same statement to the police, defendant admitted to being the shooter, admitted that he was armed with a gun when he went into rival gang territory, and said that he had been "chillin" before the shooting. Thus, counsel may have reasonably decided not to pursue a defense that necessarily relied on defendant's incriminating statements. (*People v. Olivas* (2016) 248

16

Cal.App.4th 758, 770–772 [defense counsel may have had a tactical reason for and did not provide ineffective assistance by failing to request a pinpoint instruction that was inconsistent with defendant's primary defense].)[16]

Finally, even if we were to assume that trial counsel erred in failing to request a pinpoint instruction on provocation, we would conclude that defendant was not prejudiced by his counsel's assumed error. The evidence of premeditation and deliberation was strong. As we discuss above, defendant admitted to the police that he was armed with a gun when he went into rival gang territory with two fellow gang members. He also admitted that he was "chillin" before the shooting and that he believed the unmarked police car that he had observed had left the scene before the shooting. Further, defendant's numerous face and body tattoos demonstrated his allegiance to the Black P Stones and his animosity toward, and desire to kill, Rolling 40s gang members. By contrast, and as we discuss above, the evidence of provocation was comparatively weak. Thus, we find no reasonable probability that defendant would have obtained a more favorable result had counsel requested a pinpoint instruction.

---

[16] We reject defendant's assertion that trial counsel was unaware evidence of provocation could be considered by the jury when weighing the issue of premeditation. Nothing in the record supports this assertion and it is contrary to the presumption that counsel acted within the wide range of professional norms.

## V.    DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

                                        KIM, J.

We concur:

        BAKER, Acting P. J.

        MOOR, J.

18